# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3711
_____

Abel Lopez-Cortaza

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: December 14, 2017
Filed: June 27, 2018
[Unpublished]

_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.

_____

PER CURIAM.

Abel Lopez-Cortaza petitions for review of the Board of Immigration Appeals's ("Board") denial of his application for asylum and withholding of removal under the Convention Against Torture (CAT). The Board affirmed the immigration judge's (IJ) denial of asylum, finding that Lopez-Cortaza failed to establish a nexus between past persecution or a well-founded fear of future persecution and a protected ground.

However, the Board vacated the IJ's grant of CAT protection, finding that Lopez-Cortaza is unlikely to face torture upon his return to Mexico. We deny his petition for review.

## I. *Background*

Lopez-Cortaza first unlawfully entered the United States in 2005. In 2006, he met and married an American woman. In 2007, after being detained by immigration officials, Lopez-Cortaza voluntarily departed the United States for Mexico, his home country. Shortly thereafter, his wife joined him. She met Lopez-Cortaza at the United States-Mexican border. Lopez-Cortaza, using his wife's car, then drove the couple to Las Choapas, Veracruz, Mexico, where they planned to live with his mother. During the trip to Veracruz, the Mexican Army stopped them four times to check for drugs and guns, but each time permitted the couple to proceed after discovering no contraband. At all times during their Mexican trip, their vehicle displayed American-issued license plates. The record shows that during this period arbitrary arrests and detentions were widespread in Mexico, and Lopez-Cortaza and his wife received advice from a local man not to stay too long in the country because they were driving a car with American plates.

After spending two weeks in Veracruz, the couple decided to move to Coatzacoalcos to stay at his uncle's vacant house. Lopez-Cortaza stated that he and his wife experienced some trouble with the Mexican police. For instance, on one occasion they were forced to pay 900 pesos because Lopez-Cortaza drove his wife's car (still with American plates). After about three months in Coatzacoalcos, Ms. Lopez[1] returned to the United States with her car. The record does not show that Ms. Lopez ever drove alone while in Mexico.

---

[1]The administrative record, the IJ, and Lopez-Cortaza identified Lopez-Cortaza's wife as "Mrs. Lopez" or "Ms. Lopez."

Lopez-Cortaza again illegally entered the United States in June 2007. Colorado police arrested him for driving without a license and later arrested him again for drunk driving. Lopez-Cortaza served jail time, after which he voluntarily departed for Mexico in 2009 with an IJ's permission. At the end of 2009, Ms. Lopez returned to Mexico to be with her husband. The two—again with Lopez-Cortaza driving a car with an American license plate—were harassed by the Mexican authorities. The officers stopped them multiple times while they were driving and demanded money. After a time, Ms. Lopez, discontent in Mexico, drove back to the United States. Lopez-Cortaza reported that he suffered no harassment from the Mexican authorities after his wife—and the car with its American license plate—were out of the picture.

Ms. Lopez returned to Mexico in 2010. Initially, the couple resided in Playa del Carmen, where they reported no incidents of harassment. However, economic necessity caused the couple to move back to Las Choapas, Veracruz, after about five months. In Las Choapas, they again faced police harassment. As summarized by the IJ, in 2011:

> Two men—neither in uniform—got in the truck and asked [Lopez-Cortaza] for his documents. Although they were not in uniform, one showed [Lopez-Cortaza] his badge and the other carried a gun. After [Lopez-Cortaza] gave the men his election ID card, the men arrested [Lopez-Cortaza]. They told him he was arrested because he had stolen the truck. He was forced to exit the truck and then the officers got in. Soon after, six or seven other police officers arrived to take [Lopez-Cortaza]. As he was being taken away, he stated that his wife did not know the city and threw the truck keys to her. He was then placed in handcuffs and beaten in front of his wife. . . .
>
> After he arrived at the police station, [Lopez-Cortaza] was placed in a room and beaten by four police officers with different objects. For example, he was beaten with the butt of a rifle and some handcuffs. Additionally, he was assaulted with "an electric thing that [they] had for animals." . . . [Lopez-Cortaza] testified that he was injured, bloody, and

suffered scarring from the police attacks. . . . He testified that he thinks the beating spanned 10-15 minutes, and they eventually stopped because he was on the ground and no longer moving very much. Additionally, they noticed blood coming from his head. The police told [Lopez-Cortaza] they hit him because they wanted him to confess that he stole the truck but he said no.

Admin. Rec. at 103–04.

Lopez-Cortaza's wife eventually secured his release by paying 4,600 pesos. He did not seek hospital treatment for his injuries. His wife then returned to the United States. Lopez-Cortaza followed her two and a half months later, again unlawfully entering the United States. This time, he filed an asylum claim within one year of his entry into the United States, claiming he was persecuted by Mexican authorities because his wife is American.

After hearing testimony and evaluating documentary evidence, the IJ denied Lopez-Cortaza's asylum application. The IJ concluded that Lopez-Cortaza failed to demonstrate that he had suffered past persecution because of his marriage to an American woman. Rather, the source of Lopez-Cortaza's targeting by Mexican officials was likely due to the American license plates on the car they drove each time Ms. Lopez came to Mexico. The IJ also found that Lopez-Cortaza presented no evidence showing a well-founded fear of future persecution that had a "basis in reality." *Id.* at 109. Nevertheless, she concluded that under the CAT, the Las Choapas incident qualified as torture; she further concluded that Lopez-Cortaza "has met his burden to establish it is 'more likely than not' that he will be tortured with the acquiescence of a government official if he is returned to Mexico." *Id.* at 111. The IJ then granted Lopez-Cortaza's application for withholding of removal under the CAT.

The government appealed the IJ's order to the Board. The Board affirmed the IJ's denial of asylum, but it reversed the IJ's grant of withholding of removal under

the CAT. The Board "acknowledge[d] the background evidence of widespread corruption and other human rights problems" in Mexico, but it concluded that Lopez-Cortaza's CAT application must be denied because Lopez-Cortaza could: (1) avoid Las Choapas altogether, and (2) obtain Mexican license plates for his car. *Id.* at 5. The Board then vacated the IJ's order withholding Lopez-Cortaza's removal. Lopez-Cortaza appeals.

We have jurisdiction to review the final order of the Board. *See* 8 U.S.C. § 1252(a).

## II. *Discussion*
### A. *Standard of Review*

"[W]e review an agency's legal determinations de novo, according substantial deference to the agency's interpretation of the statutes and regulations it administers." *Tang v. INS*, 223 F.3d 713, 718–19 (8th Cir. 2000) (citation omitted). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations,'" and "[t]he judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)).

The Board's factual findings "are subject to a substantial evidence standard of review," meaning that the findings "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Tang*, 223 F.3d at 718 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). In other words, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We review "[o]nly the BIA order . . . , including the IJ's findings and reasoning to the extent they were expressly adopted by the BIA." *Fofanah v. Gonzales*, 447 F.3d 1037,

1040 (8th Cir. 2006) (citation omitted). "We read the BIA opinion . . . to adopt the IJ's reasoning in relevant part, and we . . . consider both the BIA's opinion and the decision of the IJ in our review." *Rafiyev v. Mukasey*, 536 F.3d 853, 856 (8th Cir. 2008) (citation omitted).

## B. *Asylum*

Lopez-Cortaza says that the Board wrongly denied his asylum application because substantial evidence in the record supports the conclusion that his wife was at least "one central reason" for his persecution at the hands of Mexican authorities. In addition to challenging the Board's findings, Lopez-Cortaza also makes two additional attacks on the Board's decision. First, he argues that the Board abused its discretion by finding that Lopez-Cortaza also was stopped by the Mexican police in his wife's absence. Second, he argues that the Board erred by failing to determine whether his proposed social group is cognizable under the law.

### 1. *One Central Reason for Persecution*

An "applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b). A refugee is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The applicant bears the burden of proof "to establish that he or she is a refugee." 8 C.F.R. § 1208.13(a). "To establish that the applicant is a refugee . . . , the applicant must establish that race, religion, nationality, membership

in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). Additionally, "[a]n applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution." 8 C.F.R. § 1208.13(b)(1).

"Persecution is 'the infliction or threat of death, torture, or injury to one's person or freedom, on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Malonga v. Mukasey*, 546 F.3d 546, 552 (8th Cir. 2008) (quoting *Regalado-Garcia v. INS*, 305 F.3d 784, 787 (8th Cir. 2002)). "[M]ental or emotional injury may in part constitute persecution." *Shoaira v. Ashcroft*, 377 F.3d 837, 844 (8th Cir. 2004) (citation omitted). But "'persecution is an extreme concept.' Low-level intimidation and harassment does not rise to the level of persecution." *Id.* (quoting *Eusebio v. Ashcroft*, 361 F.3d 1088, 1090 (8th Cir. 2004)). The asylum applicant must show particularized persecution of himself and not of the general population. *Mohamed v. Ashcroft*, 396 F.3d 999, 1003 (8th Cir. 2005) (citation omitted). "Harm arising from general conditions such as anarchy, civil war, or mob violence will not ordinarily support a claim of persecution." *Id.* (citations omitted). Additionally, persecutions can stem from mixed motives, and the finding of a particular motive "do[es] not . . . preclude a finding of additional motives that may concern a protected ground." *Marroquin-Ochoma v. Holder*, 574 F.3d 574, 577 (8th Cir. 2009) (citing *De Brenner v. Ashcroft*, 388 F.3d 629, 637 (8th Cir. 2004)).

Here, the Board affirmed the IJ's decision, agreeing with the IJ that Lopez-Cortaza "did not show that he had been mistreated by the Mexican police on account of his family." Admin. Rec. at 3. Rather, Lopez-Cortaza was stopped "for reasons other than his familial relationship," including "traffic infractions" and "law enforcement-related reasons, including that [the couple's] car was not registered or licensed in Mexico." *Id.* at 3–4. Lopez-Cortaza himself acknowledged at least four times during his testimony before the IJ that the most likely (and only) reason for the

stops was the automobile's American license plates.[2] Further, he acknowledged that he knew of at least one other person, not married to an American woman, who also was stopped and extorted by the police.

Lopez-Cortaza argues that this is a mixed motive case. His wife—a tall, white, blond-haired, non-Hispanic woman who spoke very little Spanish—was with him every single time he was targeted by the authorities. Thus, she could have been another central reason he was targeted. However, the record contains no evidence that Lopez-Cortaza was ever targeted because of his wife. Each time, the Mexican authorities cited the American car plates as the reason for the stops. Lopez-Cortaza himself also testified that this was the reason. The coincidence of his wife's presence at the scene during the police stops, without more, is insufficient to infer causation in this case. Thus, substantial evidence in the record supports the Board's conclusion that Lopez-Cortaza's negative encounters with the Mexican authorities came from his use of American license plates and the authorities' desire to extort money. Neither of these reasons constitutes a protected basis under 8 U.S.C. § 1158(b)(1)(B)(i).

### 2. *Collateral Issues*

Lopez-Cortaza claims that the Board incorrectly found that he was stopped and extorted by the Mexican police even when his wife was absent. Lopez-Cortaza's brief does not cite to any part of the Board's order that contains the challenged factual

---

[2]*See* Admin. Rec. at 155 ("Because he said that the car was an American car, and that I couldn't drive an American car in Mexico."); *see also id.* at 159 ("I explained to him everything that I was told by the traffic police, and he told me that it wasn't illegal to drive an American car, but that my wife had to be with me the whole time."); *id.* at 169 ("Because the transit–the traffic police said that I had a trailer and that my license wasn't valid for this."); *id.* at 171 ("Well, I think it was because of the plates—because of the American plates, because you could see the whole time they were—that they were American plates, because they never told me why they stopped me.").

finding. Our review of the order uncovered no such finding. Consequently, Lopez-Cortaza has failed to show the Board made an erroneous factual finding.

We decline to consider Lopez-Cortaza's challenge to the Board's conclusion that his proposed social group is not a cognizable protected group. "As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) (citations omitted). In *Saldana v. Lynch*, we noted that the Board failed to address directly the question of whether petitioners had identified a cognizable social group. 820 F.3d 970, 975 (8th Cir. 2016). However, we concluded that resolution of that issue was unnecessary because substantial evidence supported the Board's conclusion that petitioners could avoid future persecutions through internal relocation and because petitioners feared persecution by private, not governmental, actors. *Id.* at 975–78. Here, as in *Saldana*, it was unnecessary for the Board to resolve whether Lopez-Cortaza identified a cognizable protected social group. Substantial evidence supports the Board's finding that the Mexican police harassed Lopez-Cortaza because of police corruption and his use of foreign automobile license plates.

### C. *Withholding of Removal under the CAT*

Lopez-Cortaza next argues that the Board erred by reversing the IJ's order to withhold his removal under the CAT. He asserts that the Board improperly discounted the threat of future persecutions, minimized general country condition evidence, and placed undue emphasis on internal relocation. We disagree.

"An applicant seeking relief under the Convention Against Torture bears the burden of establishing 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Guled v. Mukasey*, 515 F.3d 872, 881 (8th Cir. 2008) (quoting 8 C.F.R. § 208.16(c)(2)). "Torture is narrowly defined as an extreme form of cruel and inhuman treatment intentionally inflicted by or with the acquiescence of a public official." *Alemu v. Gonzales*, 403 F.3d 572, 576 (8th Cir.

-9-

2005) (citations omitted). In assessing a CAT claim, "all evidence relevant to the possibility of future torture should be considered, including, but not limited to: past torture inflicted upon the applicant; *the applicant's ability to relocate to another area of the country where torture is unlikely*; and gross, flagrant, or mass violations of human rights." *Ngure v. Ashcroft*, 367 F.3d 975, 992 (8th Cir. 2004) (emphasis added) (citing 8 C.F.R. § 208.16(c)(3)).

Here, the Board did not discount the threat of future torture. The Board left undisturbed the IJ's finding that the 2011 Las Choapas incident amounted to torture. But the Board found that substantial evidence supported the IJ's conclusion that Lopez-Cortaza could eliminate any future threat by avoiding travel in Las Choapas.[3] And even if Lopez-Cortaza did not avoid the area, future torture is still unlikely. Lopez-Cortaza could readily avoid driving a car with American license plates. Lopez-Cortaza bore the burden of proof to show the likelihood of future torture, and evidence was lacking. *See* 8 C.F.R. § 1208.16(c)(2).

The Board also did not disregard or minimize the evidence of general country conditions. General country background evidence is required whenever available. *See Matter of S-M-J-*, 21 I. & N. Dec. 722, 724 (BIA 1997) (en banc); *see also Matter of H-L-H- & Z-Y-Z-*, 25 I. & N. Dec. 209, 213 (BIA 2010) ("State Department reports on country conditions . . . are highly probative evidence and are usually the best source of information on conditions in foreign nations."). In its order, the Board acknowledged Mexico's reputation for governmental corruption and human rights violations, but it nevertheless concluded that the general country evidence, along with Lopez-Cortaza's experiences with the Mexican authorities, was insufficient to establish a likelihood of future torture. Lopez-Cortaza, in arguing that the Board minimized or disregarded the general country evidence, essentially is asking us to re-weigh the evidence, and that we will not do. *See Mazariegos v. Office of the U.S.*

---

[3]Lopez-Cortaza does not dispute that his presence in Las Choapas is required.

*Attorney Gen.*, 241 F.3d 1320, 1323 (11th Cir. 2001) ("We have described the substantial evidence test as 'deferential,' and have emphasized we may not 're-weigh the evidence' from scratch." (citation omitted)); *see also Woldemeskel v. INS*, 257 F.3d 1185, 1192 (10th Cir. 2001) ("We may not weigh the evidence, and we will not question the immigration judge's or BIA's credibility determinations as long as they are substantially reasonable.").

Finally, the Board did not place undue weight on internal relocation. This factor is one of several required in the CAT analysis, *see Ngure*, 367 F.3d at 992. Here, the Board determined that internal relocation is feasible; Lopez-Cortaza presented no evidence showing that he could not relocate. *See Poniman v. Gonzales*, 481 F.3d 1008, 1011 (8th Cir. 2007) ("When the applicant has not established past persecution, the applicant bears the burden of establishing relocation would be unreasonable.") (citing 8 C.F.R. § 1208.16(b)(3)(i); *Mohamed v. Ashcroft*, 396 F.3d 999, 1006 (8th Cir. 2005)); *see also Malonga*, 546 F.3d at 556 (concluding that petitioner's CAT application failed because petitioner failed to "establish that he could not travel to an area of the country where he would not be subject to torture"). Furthermore, other considerations favored removal as well. Even assuming Lopez-Cortaza experienced one incident of torture, he has not shown he is likely to face that same threat upon his return to Mexico. *See Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005) ("Under the CAT future torture is not presumed on the basis of a showing of past torture."). Lopez-Cortaza could avoid being stopped by the authorities by driving a car registered to operate in Mexico. Finally, the record shows that Lopez-Cortaza could live—and did live—in numerous localities in Mexico without the threat of torture. On this record, substantial evidence supports the Board's decision to deny Lopez-Cortaza withholding of removal under the CAT and does not compel a contrary conclusion.

### III. *Conclusion*

Accordingly, we deny Lopez-Cortaza's petition for review.

_____